[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-16268

_____

D.C. Docket No. 1:12-cr-20367-FAM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHEROND DURON KING,
a.k.a. Ron,
a.k.a. Shearon King,
a.k.a. Shearond King,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 9, 2014)

Before HULL, BLACK and FARRIS,[*] Circuit Judges.

PER CURIAM:

_____
[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Sherond Duron King, Jr., appeals his convictions and sentences arising from a string of armed robberies he committed in July 2011. Specifically, a jury convicted King of (1) conspiring to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a); (2) obstructing interstate commerce by robbing My Dream Coin Laundry, in violation of 18 U.S.C. § 1951(a); (3) using, carrying, or possessing a firearm in furtherance of the My Dream Coin Laundry robbery, in violation of 18 U.S.C. § 924(c)(1)(A); (4) obstructing interstate commerce by robbing a MetroPCS store, in violation of 18 U.S.C. § 1951(a); (5) using, carrying, or possessing a firearm in furtherance of the MetroPCS robbery, in violation of 18 U.S.C. § 924(c)(1)(A); (6) obstructing interstate commerce by robbing a Subway store, in violation of 18 U.S.C. § 1951(a); (7) using, carrying, or possessing a firearm in furtherance of the Subway robbery, in violation of 18 U.S.C. § 924(c)(1)(A); (8) obstructing interstate commerce by robbing a BP gas station, in violation of 18 U.S.C. § 1951; and (9) using, carrying, or possessing a firearm in furtherance of the BP robbery, in violation of 18 U.S.C. § 924(c)(1)(A). The district court sentenced King to a total of 1,062 months' imprisonment, and he now pursues numerous issues on appeal. We conclude the arguments King raises on appeal fail, and we therefore affirm his convictions and sentences.

## I.  BACKGROUND

On July 9, 2011, King and another man, Graylin Kelly, robbed My Dream Coin Laundry in Miami Shores, Florida.[1]  According to Nickelson Charles, an employee of the laundromat who was working that night, King was wearing a white tank top and had dreadlocks while Kelly was wearing a jacket.  The two men entered the store and walked around the laundromat for 10 to 20 minutes.  Eventually, one of the men asked Charles to make change and, once he opened the cash register, King pointed a gun at Charles's face and demanded the money from the register.  After King again demanded that Charles turn over the money and threatened to shoot him, Charles opened the cash register and gave King all of the money in the drawer.

Several days after the robbery, Charles identified King as the robber from a photographic lineup.  Charles was unable to identify Kelly, but stated he could not forget King's face.  Detective Kerry Turner with the Miami Shores Police Department created the lineup by using six photographs, including a picture of King from his recent booking following his arrest.  In the array, King is shown wearing a white tank top.  Detective Turner testified that he chose not to use King's driver's license photograph because the booking photograph was more

---

[1] Kelly pled guilty and is not a party to the instant appeal.

3

recent.  In selecting the photographs for the array, Detective Turner looked for individuals with similar facial features and hairstyles.

On July 12, 2011, three days after the My Dream Coin Laundry robbery, King and Kelly robbed a MetroPCS store.  After the men entered the store, King approached the store manager.  King pulled out a gun, pointed it at the manager, and told him to "open the safe."  The manager put the cash register box on the counter and stared at King.  In response, King pointed the gun at the manager and said "don't look at me, don't look at me."  King and Kelly then took the money and ran out of the store.

Subsequently, a police officer showed Judith Brea, an employee who was present in the store at the time of the robbery, a photographic lineup.   Brea immediately identified King as one of the robbers.  The officer also showed Jose Enrique Lantigua, the store manager, a photographic lineup from which he identified King as the robber.

Later on July 12, 2011—the same day as the MetroPCS robbery—King and Kelly robbed a Subway store.  The men entered the store and looked around. While Arthur Joseph, an employee at the Subway, waited for King and Kelly to decide what to order, another Subway employee, Treniese Stubbs, was working at the cash register.  When Stubbs opened the cash register, King suddenly pulled out a gun, pointed it at her head, and demanded the money from the register.  After

4

taking the money, the men ran out of the store. Several days after the robbery, a police officer showed Joseph a photographic lineup from which Joseph identified King as the man who pointed a gun at Stubbs and demanded the money. An officer also showed Stubbs a photographic lineup from which she identified King as the man who pointed a gun at her and took the money from the cash register.

On July 13, 2011, the day after the Subway and MetroPCS robberies, King and Kelly robbed a BP gas station. After entering the store at the gas station, King waited in line at the cash register until he reached the front of the line, at which point he aimed a gun at Wilmer Pineda, the employee working the cash register, and demanded the money from the register. King took the money from the cash register and he and Kelly left the store. Approximately one week after the robbery, Pineda identified King from a photographic lineup as the man who took the money from the register. Fanor Saravia, a man who maintained the landscaping at the BP station and who was present inside the store during the robbery, also identified King from a photographic lineup as one of the robbers.

A federal grand jury returned an indictment charging King with conspiring to rob, as well as actually robbing, the My Dream Coin Laundry, the MetroPCS store, the Subway store, and the BP gas station. The indictment also charged King with knowingly using, carrying, or possessing a firearm in furtherance of each of the robberies.

5

Prior to trial, King filed a motion to suppress the witnesses' out-of-court identifications of him and to prohibit the witnesses from identifying him in court. King argued the procedures used during the photographic lineups were unduly suggestive and that the witnesses' identifications were not reliable. Following an evidentiary hearing, the district court denied the motion to suppress.[2]

King's case proceeded to trial. After the Government rested its case-in-chief, King moved for a judgment of acquittal on the firearms counts, arguing there was insufficient evidence the gun he used was real and met the statutory definition of a firearm. The district court denied the motion, and, following the close of the defense case, King renewed his motion for a judgment of acquittal. The district court again denied the motion, and the jury found King guilty on all counts.

At the sentencing hearing, using information from the presentence investigation report, the district court calculated a base offense level of 24 for King's conspiracy and robbery convictions and determined King had a criminal history category of III, yielding a guidelines range of 63 to 78 months' imprisonment. King's guidelines range on the firearms convictions was a mandatory 984-month sentence, composed of a consecutive seven-year sentence

---

[2] The district court again denied the motion to suppress after hearing the trial testimony, finding that the photographic lineups were not unduly suggestive and that the identifications were reliable.

6

on Count Three for brandishing a firearm, and consecutive terms of 25 years' imprisonment for each of his three other firearms convictions (Counts Five, Seven, and Nine).  King's resulting guidelines range was 1,047 to 1,062 months' imprisonment.

King objected to the seven-year mandatory minimum sentence for brandishing a firearm, arguing that based on the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and under the Fifth and Sixth Amendments, the element of "brandishing" had to be charged in the indictment and found by the jury beyond a reasonable doubt.  King recognized that, at the time, his argument was foreclosed by Supreme Court precedent, but he nonetheless raised the objection to preserve the issue in light of the Supreme Court's then-recent grant of certiorari in *Alleyne v. United States*, 133 S. Ct. 420 (2012).

The district court sentenced King to a total sentence of 1,062 months' imprisonment.  King's total sentence was comprised of concurrent terms of 78 months' imprisonment on the conspiracy and substantive robbery counts (Counts One, Two, Four, Six, and Eight); a consecutive term of 84 months' imprisonment on his first firearm count (Count Three); and 300 months' imprisonment on each of his three other firearms counts (Counts Five, Seven, and Nine), which were

7

imposed to run consecutively to his other sentences and to each other.  King objected to the reasonableness of the sentence and this appeal followed.

## II.  ANALYSIS

King raises six issues on appeal.  He argues that (1) the Government did not present any evidence the gun he used during the four robberies met the legal definition of a firearm and his § 924(c) convictions should therefore be vacated; (2) the district court abused its discretion by refusing to give a jury instruction regarding cross-race identifications; (3) the district court should have excluded Charles's identification of King because the photo array used to obtain the identification was unduly suggestive; (4) the cumulative effect of the district court's purported errors requires reversal; (5) the district court erred by imposing mandatory minimum sentences on his firearm offenses because the jury did not find he brandished a firearm beyond a reasonable doubt, nor did it find his other firearm convictions were "second or subsequent"; and (6) his sentence is unreasonable.  We address each issue in turn.

### A.  Legal Definition of a Firearm

King argues that because the police never recovered the gun he used during the robberies and the Government did not introduce the gun into evidence at trial, no evidence existed that the gun met the legal definition of a firearm codified in 18

8

U.S.C. § 921(a)(3).[3]  He contends the lay testimony of the victims of the robberies was insufficient to prove beyond a reasonable doubt that the gun was designed "to expel a projectile by the action of an explosive."

King's argument is foreclosed by this Court's decision in *United States v. Woodruff*, 296 F.3d 1041, 1049 (11th Cir. 2002).  In *Woodruff*, we rejected the identical argument King now asserts, holding that "the [G]overnment need not show to a scientific certainty that a defendant is carrying a device that fires projectiles by means of an explosive." *Id.*  Thus, "the [G]overnment need not offer the gun itself into evidence or produce an expert witness to identify a 'firearm.'" *Id.*  Instead, "[t]he Government must present sufficient testimony, including the testimony of lay witnesses, in order to prove beyond a reasonable doubt that a defendant used, possessed or carried a 'firearm' as that term is defined for purposes of § 924(c)." *Id.*

Viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in favor of the jury's verdict, *see United States v. Isnadin*, 742 F.3d 1278, 1303 (11th Cir. 2014), sufficient evidence established that

---

[3] Section 921(a)(3) defines a firearm as:

(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.  Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

the gun King used in each of the robberies was a firearm within the meaning of § 921(a)(3).  The jury heard testimony from victims of each of the robberies, several of whom had the weapon thrust directly in their faces.  Each of the seven eye witnesses testified that King pointed a gun during the commission of the offense, and the record also indicates that the jurors saw surveillance footage and still photographs of each armed robbery.  Contrary to King's arguments, in order to carry its burden of proof on the § 924(c) counts, the Government did not need to rely on expert testimony, introduce the weapon at trial, or otherwise demonstrate that the gun used during the robberies was actually fired or discharged.  *Woodruff*, 296 F.3d at 1049.  On this record, we are satisfied that a reasonable trier of fact could find the evidence established King was guilty of the § 924(c) offenses beyond a reasonable doubt.  *See Isnadin*, 742 F.3d at 1303 ("Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." (internal quotation marks omitted)).

B.  *Jury Instruction on Cross-Race Identification*

King contends the district erred by refusing to give a jury instruction regarding the unreliability of cross-race identifications.  King argues his theory of defense was premised on the fact that he is an African-American man and that the witnesses who identified him were not African-American individuals, thus rendering their identifications inherently unreliable.

10

We review for abuse of discretion a district court's refusal to give a requested jury instruction. *United States v. McQueen*, 727 F.3d 1144, 1154 (11th Cir. 2013). A criminal defendant is entitled to have the jury instructed regarding his theory of defense "separate and apart from instructions given on the elements of the charged offense if there has been some evidence adduced at trial relevant to that defense." *Id.* (internal quotation marks omitted). We view the evidence in the light most favorable to the defendant in determining whether there was a proper evidentiary foundation for the instruction. *United States v. Palma*, 511 F.3d 1311, 1315 (11th Cir. 2008). When a district court declines to give a requested instruction for which there was a sufficient evidentiary basis, we will reverse "only if (1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *Id.* (internal quotation marks omitted). In determining whether an instruction substantially covered the proposed instruction, we "need only ascertain whether the charge, when viewed as a whole, fairly and correctly states the issues and the law." *United States v. Gonzalez*, 975 F.2d 1514, 1517 (11th Cir. 1992).

The district court did not abuse its discretion by declining to give King's requested jury instruction. King specifically requested the district court instruct the jury as follows:

11

You may also consider whether an identifying witness is not of the same race as the Defendant and whether that fact might have had an impact on the accuracy of the witness's original perception, and/or the accuracy of the subsequent identification. You should consider that, in ordinary human experience, people may have greater difficulty in accurately identifying members of a different race.

However, no evidence was adduced at trial related to this point. While King presented evidence about other factors that might be relevant to the ability of a witness to make a reliable identification, such as the witness's anxiety and opportunity to view the suspect, *see Perry v. New Hampshire*, 132 S. Ct. 716, 727 (2012), King did not present any evidence regarding the effect of race on the ability of a witness to make an accurate identification, nor did he cross-examine any of the witnesses to determine whether they had difficulty making cross-racial identifications. Accordingly, King failed to adduce a sufficient evidentiary basis for the requested instruction, and the district court did not abuse its discretion in declining to give it.

Even if King had presented sufficient evidence to warrant the requested instruction, we would not reverse on this record because the charge the district court actually gave substantially covered the proposed instruction and the failure to give the instruction did not substantially impair King's ability to present an effective mistaken-identification defense. The district court instructed the jurors as follows:

12

The Government must prove beyond a reasonable doubt that the defendant was the person who committed the crime. If a witness identifies a defendant as the person who committed the crime, you must decide whether the witness is telling the truth. But even if you believe the witness is telling the truth, you must still decide how accurate the identification is.

I suggest that you ask yourself these questions among others:

Did the witness have an adequate opportunity to observe the person at the time that the crime was committed? How much time did the witness have to observe the person? How close was the witness? Did anything affect the witness' ability to see? Did the witness know or see the person at an earlier time?

You may also consider the circumstances of the identification of the defendant such as the way the defendant was presented to the witness for identification and the length of time between the crime and the identification of the defendant.

After examining all the evidence, if you have a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

This instruction, viewed as a whole, fairly and correctly stated the issues and the law. *See Gonzalez*, 975 F.2d at 1517. The instruction was sufficiently comprehensive to assist the jury in evaluating the witnesses' identification testimony, highlighted potential questions for the jurors while also suggesting that those questions were not the only factors they should consider, informed the jurors that they should assess the reliability of the identifications even if they believed the witnesses were telling the truth, suggested they should consider the identification procedure, and informed the jurors that if they had a reasonable doubt regarding

13

the identity of the defendant as the robber, they should find him not guilty. Accordingly, the district court committed no reversible error in using the pattern jury instruction on identification rather than the requested instruction in this case.[4]

## C. Photographic Lineup

King next argues that the photographic lineup from which Nickelson Charles identified him was unduly suggestive because King was the only individual shown wearing a white tank top, which was the same color and type of shirt worn by the robber of the My Dream Coin Laundry. King maintains a different photograph of him could have been used, or the pictures could have been presented such that only the individuals' faces could be seen.

It is well established that due process restrains the admission of eyewitness identifications at trial "when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *United States v. Elliot*, 732 F.3d 1307, 1309-10 (11th Cir. 2013) (internal quotation marks omitted); *see also Perry*, 132 S. Ct. at 720. However, "[a]n identification infected by improper police influence . . . is not automatically excluded." *Perry*, 132 S. Ct. at 720. Instead, an identification must be excluded only if the

---

[4] We do not suggest that instructions regarding cross-racial identifications are never warranted. *See United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir. 1997) (stating that defendants may "request jury instructions that highlight particular problems in eyewitness recollection" and suggesting that cross-racial identification may be such a problem). We also do not suggest that such instructions must always be given. We have no occasion to consider the propriety of such instructions in general because we hold only that, on this record, the district court did not abuse its discretion in failing to give the requested instruction.

identification procedure created "a very substantial likelihood of irreparable misidentification" *and* the identification did not contain sufficient indicia of reliability. *Id.* (internal quotation marks omitted). Thus, this Court engages in a two-step analysis in assessing a district court's decision to admit an out-of-court identification, asking first whether the original identification procedure was unduly suggestive and, second, whether, under the totality of the circumstances, the identification was nonetheless reliable. *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).

In his initial brief, King argues only that the photographic lineup from which Charles identified him as the robber of the My Dream Coin Laundry was unduly suggestive. The district court denied King's motion to suppress the identification, however, because the procedure was not unduly suggestive and because the identification was reliable. To warrant exclusion of the evidence, King had to convince us that both of the district court's findings were incorrect, but King does not elaborate any argument on appeal regarding the reliability of Charles's identification. He has therefore abandoned an issue on which he had to prevail in order to obtain reversal. *See Perry*, 132 S. Ct. at 720. We have explained that "[w]hen an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed."

15

*Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). Furthermore, although King argues in passing in his brief that "given the dearth of other evidence against him and the limited time the victims viewed the robbers the conviction based on that tainted identification should be reversed," his terse statement did not sufficiently raise the reliability issue so as to save it from abandonment. *See id.* at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). Accordingly, we do not address King's arguments regarding the purported suggestiveness of the photographic lineup because doing so is unnecessary, and we affirm the district court's decision to admit the evidence.

## D.  *Cumulative Error*

King next contends that even if none of the alleged errors he has asserted warrant reversal of his convictions, the cumulative effect of those errors deprived him of a fair trial.  Under the cumulative error doctrine, "an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005).  However, "where there is no error or only a single error, there can be no cumulative error." *United States v. House*, 684 F.3d 1173, 1210 (11th Cir. 2012).

16

Because King has not identified any errors, there can be no cumulative error and we therefore affirm his convictions.

## E.  Sentences on the Firearm Convictions

Relying on the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), King argues the district court erred by imposing a seven-year mandatory minimum sentence for brandishing a firearm during a crime of violence because "brandishing" is an element of the offense that had to be proved to the jury beyond a reasonable doubt.  He contends that because the element of brandishing was neither charged in the indictment nor found by the jury beyond a reasonable doubt, his § 924(c) convictions must be vacated and his case remanded for resentencing.

King further maintains that his mandatory consecutive 25-year sentences on Counts Five, Seven, and Nine should be reversed because the jury did not find those convictions were "second or subsequent."  He asserts that the second or subsequent nature of the convictions is an element of the offense under *Alleyne* such that it must be charged in the indictment and found by the jury beyond a reasonable doubt.

### 1.  Brandishing a Firearm

We begin our analysis of King's *Alleyne* argument with a brief discussion of the standard of review applicable to such claims.  We have

17

previously held that preserved claims of error under *Apprendi* are reviewed *de novo* because the applicability of *Apprendi* to a specific case is a pure question of law. *See United States v. Candelario*, 240 F.3d 1300, 1306 (11th Cir. 2001); *United States v. Rogers*, 228 F.3d 1318, 1321 (11th Cir. 2000), *abrogated on other grounds by United States v. Sanchez*, 269 F.3d 1250 (11th Cir. 2001) (*en banc*). In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. at 2362-63. Subsequently, the Supreme Court held in *Harris v. United States*, 536 U.S. 545, 568, 122 S. Ct. 2406, 2420 (2002), *overruled by Alleyne*, 133 S. Ct. at 2163, that the rule announced in *Apprendi* did not apply to facts that increase a defendant's mandatory minimum sentence. While King's case was pending on appeal with this Court, however, the Supreme Court overruled *Harris*, holding in *Alleyne* that the "distinction between facts that increase the statutory maximum and facts that increase only the mandatory minimum" was inconsistent with *Apprendi*. *Alleyne*, 133 S. Ct. at 2155, 2163. Instead, the Court held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Id.* at 2155. The Supreme Court specifically concluded a finding that a firearm was brandished during a crime of

18

violence is an element of an 18 U.S.C. § 924(c)(1)(A)(ii)[5] offense that must be found by a jury beyond a reasonable doubt. *Id.* at 2163.

Because the Supreme Court in *Alleyne* simply extended *Apprendi* to facts that increase a defendant's mandatory minimum sentence, *see Alleyne*, 133 S. Ct. at 2160, we hold that preserved claims of *Alleyne* error, like preserved claims of *Apprendi* error, are reviewed *de novo*.  King adequately preserved his objection to receiving an enhanced mandatory minimum sentence under § 924(c)(1)(A)(ii) by arguing that, under *Apprendi* and the Sixth Amendment, the jury had to find beyond a reasonable doubt that he brandished a firearm.  *See United States v. McKinley*, 732 F.3d 1291, 1295 & n.2 (11th Cir. 2013).

We further hold that *Alleyne* violations are subject to harmless error review. We have consistently held that *Apprendi* violations are subject to harmless error analysis.  *See United States v. Allen*, 302 F.3d 1260, 1276 (11th Cir. 2002) ("This circuit has recognized repeatedly that where an *Apprendi* violation exists . . . a reviewing court must engage in a harmless error analysis.").  We have explained that "*Apprendi* did not recognize or create a structural error that would require per se reversal," *United States v. Nealy*, 232 F.3d 825, 829 (11th Cir. 2000), and that

---

[5] Section 924(c)(1)(A) enumerates the mandatory minimum sentences for any person who uses or carries a firearm during or in relation to a crime of violence, or who possesses a firearm in furtherance of a crime of violence.  The statute provides a five-year mandatory minimum sentence for any person who uses, carries, or possesses a firearm, 18 U.S.C. § 924(c)(1)(A)(i), but imposes a seven-year mandatory minimum sentence for anyone who brandishes a firearm during the commission of the crime, *id.* § 924(c)(1)(A)(ii).

"*Apprendi* errors do not fall within the limited class of fundamental constitutional errors that defy analysis by harmless error standards," *Candelario*, 240 F.3d at 1307 (internal quotation marks omitted). We have also repeatedly held that extensions of *Apprendi*, such as those recognized in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), are subject to harmless error review. *See, e.g.*, *United States v. Dulcio*, 441 F.3d 1269, 1277 (11th Cir. 2006) ("Because [the defendant] preserved his *Blakely*/*Booker* claim at sentencing, we review for harmless error."); *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005) (explaining we will disregard a *Booker* error if it was harmless). Because we review errors under *Apprendi* and its progeny for harmless error, and *Alleyne* is simply the newest member of that same family, we readily conclude that *Alleyne* errors (i.e., errors that increase the statutory mandatory minimum) are subject to harmless error review.

The Government concedes the district court erred under *Alleyne* by imposing a seven-year sentence for King's firearm conviction in Count Three. Accepting that concession, we nevertheless conclude that reversal is not warranted because the error was harmless. *See Nealy*, 232 F.3d at 829 ("[A] constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (internal quotation marks omitted)); *see also Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). At

20

trial, the Government presented extensive evidence that King brandished a firearm during the My Dream Coin Laundry robbery. Charles testified that King pointed a gun at his face and demanded the money from the laundromat's cash register. Charles further testified that after King again demanded Charles turn over the money, King threatened to shoot him. The Government also introduced into evidence a surveillance video of the robbery. In the video, after Charles walks behind the counter in the laundromat, King lunges forward and thrusts a gun in Charles's face. King keeps the gun aimed at Charles while taking money from the counter, and then waives it at Charles as King and Kelly run from the store. Additionally, the Government presented still photographs of the robbery taken from the surveillance video. In one of the photographs, King is depicted holding a gun in one hand with his other hand bracing the firearm from underneath. The gun is pointed directly at Charles, who is located behind the counter. On these facts, it is clear beyond a reasonable doubt that a rational jury would have found King guilty of brandishing a firearm absent the *Alleyne* error. *See Nealy*, 232 F.3d at 829; *see also* 18 U.S.C. § 924(c)(4) (defining the term "brandish" as "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person"). Accordingly, we affirm King's seven-year sentence for brandishing a firearm during the commission of a violent crime.

## 2. *Second or Subsequent Convictions*

King next argues that the rationale of *Alleyne* required the indictment to charge and a jury to find beyond a reasonable doubt that the § 924(c) firearms offenses charged in Counts Five, Seven, and Nine were "second or subsequent." King raises this argument for the first time on appeal, and we therefore review it only for plain error. *See McKinley*, 732 F.3d at 1296. Under the plain error standard, we will reverse only if there is error that is plain, that affected the defendant's substantial rights, and only if the error seriously affects the fairness integrity, or public reputation of judicial proceedings. *Id.* King has not met that standard.

18 U.S.C. § 924(c)(1)(C)(i) provides that "[i]n the case of a second or subsequent conviction under this subsection, the person shall . . . be sentenced to a term of imprisonment of not less than 25 years." Section 924(c)(1)(D)(ii) requires that such sentences must run consecutively to any other term of imprisonment. 18 U.S.C. § 924(c)(1)(D)(ii). King's argument that a jury must find his convictions were "second or subsequent" runs afoul of the Supreme Court's decision in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219 (1998). "In [*Almendarez-Torres*], the Supreme Court held that the [G]overnment need not allege in its indictment and need not prove beyond a reasonable doubt that a defendant had prior convictions for a district court to use those convictions for

22

purposes of enhancing a sentence." *United States v. Shelton*, 400 F.3d 1325, 1329 (11th Cir. 2005) (internal quotation marks omitted). We have explained that the Supreme Court's holding in *Almendarez-Torres* "was left undisturbed by *Apprendi*, *Blakely*, and *Booker*," *id.*, and have repeatedly refused to depart from it until the Court itself overrules the case, *see, e.g.*, *United States v. Gandy*, 710 F.3d 1234, 1237 n.3 (11th Cir. 2013); *United States v. Thomas*, 242 F.3d 1028, 1035 (11th Cir. 2001) ("[W]e are bound to follow *Almendarez-Torres* unless and until the Supreme Court itself overrules that decision."). Finding that a defendant's convictions were "second or subsequent" is the same as finding that a defendant had a prior conviction, and the issue remains governed by *Almendarez-Torres*. *See United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013) (concluding that *Almendarez-Torres* remains binding authority notwithstanding *Alleyne* and that a jury need not find a defendant's convictions were second or subsequent under § 924(c)(1)(C)(i)).

King's argument that the holding of *Almendarez-Torres* is inconsistent with the logic of *Alleyne* is also unavailing. The Supreme Court itself explicitly declined to revisit *Almendarez-Torres* in *Alleyne*, 133 S. Ct. at 2160 n.1, and we recently rejected this same argument in *United States v. Harris*, 741 F.3d 1245, 1250 (11th Cir. 2014). In *Harris*, we recognized "that there is some tension between *Almendarez-Torres* on the one hand and *Alleyne* and *Apprendi* on the

other," but concluded "we are not free to do what the Supreme Court declined to do in *Alleyne*, which is overrule *Almendarez-Torres*." *Id.* Thus, the district court did not plainly err by imposing consecutive 25-year sentences for King's second or subsequent § 924(c) offenses.

## F. Reasonableness of King's Sentence

King contends his 1,062-month sentence is unreasonable because the nature of his offenses did not warrant such a severe sentence, and his co-conspirator, Kelly, received only 384 months' imprisonment which created a sentencing disparity. King emphasizes that while his offenses were serious, no victims were harmed, and he asserts the district court failed to consider his personal characteristics.

We review the reasonableness of a defendant's sentence under a deferential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). When reviewing the reasonableness of a sentence, we first ensure "that the district court committed no significant procedural error" and then "consider the substantive reasonableness of the sentence imposed" under the totality of the circumstances. *Id.* at 51, 128 S. Ct. at 597. In evaluating the reasonableness of a sentence, we measure the sentence against the factors outlined

in 18 U.S.C. § 3553(a).[6] *United States v. Pugh*, 515 F.3d 1179, 1188 (11th Cir.

2008).  Under our highly deferential review, we will vacate a sentence only if "we

are left with the definite and firm conviction that the district court committed a

clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence

that lies outside the range of reasonable sentences dictated by the facts of the case."

*United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (*en banc*) (internal

quotation marks omitted).

The district court did not abuse its discretion when imposing King's

sentence.  At sentencing, the district court observed that King failed to accept

responsibility for his violent offenses, failed to show any remorse, and would

likely be a recidivist if released from incarceration.  The district court explicitly

pointed to the nature and circumstances of the offenses, discussed the need to

protect the public from King's future criminal conduct, and referenced King's

personal characteristics.  Although the district court did not expressly discuss

King's history of mental illness and drug abuse, we have consistently held that the

---

[6] Section 3553(a) provides that the district court should impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" listed in § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct.  *See* 18 U.S.C. § 3553(a)(2).  In imposing a particular sentence, the court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims.  *Id.* § 3553(a)(1), (3)-(7).

district court is not required to state it has considered each of the § 3553(a) factors or to discuss each of the factors on the record. *United States v. Kuhlman*, 711 F.3d 1321, 1326 (11th Cir. 2013) ("[N]othing requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the §3553(a) factors." (internal quotation marks and ellipsis omitted)).

The district court also did not create an unwarranted sentencing disparity by sentencing King to a 1,062-month term of imprisonment while his co-conspirator, Kelly, received only a 384-month sentence. King was not similarly situated to Kelly because Kelly pled guilty to only a few counts while King went to trial and was convicted of 9 counts, including numerous § 924(c) offenses that carried mandatory consecutive sentences of at least 25 years' imprisonment. *See United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (stating that, on remand, the district court should avoid comparisons between, *inter alia*, defendants who went to trial and those who pled guilty); *see also United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) ("[D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial. There is no unwarranted disparity even when the sentence the cooperating defendant receives is substantially shorter." (citation and internal quotation marks omitted)).

26

The district court did not commit a clear error of judgment in weighing the § 3553(a) factors, and it imposed a sentence within the range of reasonable sentences dictated by the facts of the case.  Accordingly, we affirm King's sentences.

## III.  CONCLUSION

For the foregoing reasons, we affirm King's convictions and sentences.

**AFFIRMED.**